IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                      CIVIL ACTION NO.  3:12-7925

SAMIH FADL JAMMAL,

                Defendant.

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff United States of America's Motion for Summary Judgment, filed July 21, 2014. ECF No. 24.  Plaintiff contends that Defendant Jammal was ineligible to naturalize as a United States citizen, and based on the material, undisputed facts in the record, it is entitled to judgment as a matter of law.  For reasons explained below, Plaintiff's motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

This dispute concerns Defendant's naturalization as a United States citizen.  According to Plaintiff's Complaint, and undisputed by Defendant, Samih Fadl Jammal was born in and a citizen of Lebanon.  Jammal first came to the United States in January 1992.  Having married a United States citizen in March 1992, by October 1992, Jammal's status was adjusted to lawful permanent resident.

In August 1994, Jamal was invited to participate in an infant formula repackaging business involving other individuals and Lexington Wholesale Company, Inc. ("Lexington Wholesale").  Factual Basis for Guilty Plea, Def. Ex. A, ECF No. 24-2 at 3 (hereinafter "Factual

Basis").   Shortly thereafter, he began repackaging infant formula on behalf of Lexington Wholesale. *Id.* at 4.   For that purpose, Defendant Jammal operated through Jammal & Misbah Trading Company (as co-owner) and Jammal Trading Company (as sole-proprietor). *Id.*   The principal place of business for both companies was located at 1210 West Alameda Drive, Suite 103, Tempe, Arizona. *Id.*

Through these businesses, Defendant arranged the acquisition of loose cans of infant formula from retail outlets. *Id.*   The infant formula was later repackaged "in cases designed to look virtually identical to the cases used by infant formula manufacturers" and sold to Lexington Wholesale. *Id.*   These cases were provided by Lexington Wholesale and Rocky Mountain General Wholesale, Inc. ("Rocky Mountain") and "bore the various trademarks used by the manufacturers, such as product names and designs." *Id.*   According to Defendant, he believed at that time that Lexington Wholesale had permission from the manufacturers to create identical packaging. Aff. of Samih Fadl Jammal, ECF No. 6-1 (hereinafter "Def.'s Aff.").   Some of these cases were already marked with a date on the outside of the case, and Jammal or his agents added such a date to the outside of cases that did not already bear one. Factual Basis, ECF No. 24-2.   With respect to these dates, Jammal explained:

> I knew that this date was supposed to represent the "use by" or expiration date of the cans contained within the cases. I was aware that the infant formula manufacturers placed a "use by" date (also known as an expiration date) on each can of infant formula that they manufactured.   I was also aware that infant formula manufacturers placed a "use by" or expiration date on the outside of each case packed with cans of infant formula. . . .   The manufacturers placed only cans bearing the same expiration date in a given case and placed that "use by" or expiration date on the outside of the case to allow distributors and purchasers of cases of infant formula to verify at a glance the current shelf life of the product.

> Unlike the infant formula manufacturers, I did not sort cans of infant formula by "use by" or expiration date and place only cans bearing the same date in a single case.   As a result, the "use by" or expiration date that appeared on the

2

outside of each case did not accurately reflect the "use by" or expiration date appearing on each individual can of infant formula in the case.

*Id.* at 5–6.  Between October 1994 and February 1995, Lexington Wholesale paid Defendant approximately $1,725,394 "for repackaging infant formula in Arizona on their behalf" as described above. *Id.* at 4.

On March 1-2, 1995, federal agents seized repackaged infant formula from Lexington Wholesale. *Id.* at 6.  Immediately thereafter, on or about March 3, 1995, Defendant moved repackaged infant formula stored on behalf of Lexington Wholesale from States Warehouse, Inc. in Phoenix, Arizona, to Total Warehouse, Inc., also in Phoenix, Arizona. *Id.*  Shortly thereafter, on the suggestion of the individual that had originally invited Defendant's participation in the scheme, Defendant transported repackaged infant formula from Total Warehouse, Inc. to Rocky Mountain General Wholesale in Denver, Colorado. *Id.* at 6–7.  Defendant arrived at Rocky Mountain General Wholesale on March 18, 1995, but the truck loaded with repackaged infant formula was not unloaded because federal agents were then executing a search warrant at the premises. *Id.* at 7–8.

On March 20, 1995, Defendant ultimately moved the delivery truck—still containing repackaged infant formula—to the Denver Airport. *Id.* at 8.  According to Defendant, upon learning that the federal government was "interested" in that truckload of repackaged infant formula, he "called the federal government and submitted the truck load to them at Denver Colorado Airport." Def.'s Aff., ECF No. 6-1 at ¶11.

A few months later, on July 5, 1995, Jammal filed a Form N-400 application for naturalization with the agency then responsible for naturalization, the Immigration and

Naturalization Service ("INS").[1] Def.'s Ex. B, ECF No. 24-3. Question 15(a) on Form N-400 asks whether an applicant has ever "knowingly committed any crime for which [he has] not been arrested." *Id.* In response to that question, Defendant answered "no." *Id.* Consistent with that written assertion, on January 31, 1996, Defendant provided the same answer to the same question regarding his naturalization application, under oath, during an interview with an INS officer. Aff. of Agent Palmer, ECF No. 1-1 at ¶4; Def.'s Answer, ECF No.17 at ¶¶35–36. On January 31, 1996, the INS approved Defendant's naturalization application and issued naturalization certificate number 21808838 to Defendant. Aff. of Agent Palmer, ECF No. 1-1 at ¶5; Def.'s Answer, ECF No. 17 at ¶38.

On April 2, 1998, Defendant was charged on 8-counts of 35-count indictment relating to repackaged infant formula. Indictment, Def.'s Ex. E, ECF No. 24-6. On January 29, 1999, the charges in the indictment were dismissed after Defendant pleaded guilty to a one count information charging aiding and abetting the introduction and delivery for introduction into interstate commerce misbranded food, specifically repacked infant formula worth approximately $1.5 million, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 331(a), 333(a)(1). Plea Agreement, Def.'s Ex. F, ECF No. 24-7. Defendant was sentenced to a three year term of probation and a $2,000 fine. Judgment, Def.'s Ex. G, ECF No. 24-8. Defendant maintains that he did not realize his involvement in repackaging infant formula was wrong or unlawful until April 1998.[2] Def.'s Aff. at ¶¶12–13.

---

[1] Responsibilities of the INS were later transferred to the Department of Homeland Security ("DHS") and its agencies. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 110 Stat. 2135 (Nov. 25, 2002).

[2] In Paragraph 14, Defendant somewhat contradictorily states that he was not aware of any wrongdoing on his part until after he pleaded guilty in January 1999. Def.'s Aff., ECF No. 6-1. In either case, Defendant claims he realized the unlawful character of his conduct well after seeking naturalization.

Plaintiff moves for summary judgment, claiming that, as a matter of law, Defendant's naturalization must be revoked because involvement in the criminal scheme to repackage and distribute infant formula disqualified him from becoming a naturalized U.S. citizen, or, in the alternative, Defendant impermissibly concealed the material facts of his involvement during the naturalization process. *See* ECF No. 25.  Defendant timely filed a Response to the Government's motion on August 28, 2014, ECF No. 28, the Government has timely filed a Reply, ECF No. 29, and the motion is ripe for disposition.

## II.   STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587-88 (1986).

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial . . .." 10 Wright and Miller, Federal Practice and Procedure, § 2739, p. 711. Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish

5

that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

## III.   ANALYSIS

At the outset, the Court notes that "American citizenship is a precious right." *Costello v. U.S.*, 365 U.S. 265, 269 (1961); *see also Fedorenko*, 449 U.S. 490, 505 (1981) ("[O]nce citizenship has been acquired, its loss can have severe and unsettling consequences") (citations omitted). Precisely because American citizenship is so valued, "the Government 'carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship,'" *Fedorenko*, 449 U.S. at 505 (quoting *Costello*, 365 U.S. at 269), and must provide "clear, unequivocal, and convincing" evidence justifying revocation. *Id.* (quoting *Schneiderman v. U.S.*, 329 U.S. 118, 125 (1943)).

However, where the Government meets that high standard, the courts cannot "weigh equities in deciding whether to revoke [illegally procured] citizenship." *Id.* at 516–17. "[D]istrict courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of

6

material facts." *Id.* at 517.  "Once it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship." *U.S. v. Fedorenko*, 597 F.2d 946, 954 (5th Cir. 1979) (quoted by *Fedorenko*, 449 U.S. at 517). With this solemn obligation in mind, the Court turns to consideration of whether the Government has met its heavy burden in seeking denaturalization.

## A.  Illegal procurement

By statute, proceedings to revoke naturalized citizenship may be brought "on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact by willful misrepresentation . . ." 8 U.S.C. § 1451(a).  "[A] naturalized citizen's failure to comply with the statutory prerequisites for naturalization renders his certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Fedorenko*, 449 U.S. at 514.  The Government argues that Defendant illegally procured naturalization by (1) committing unlawful acts during the relevant statutory period; (2) committing of a crime of moral turpitude; and (3) providing false testimony to INS in the naturalization process.  Each argument is discussed in turn below, and any one of these grounds, if proven, is independently sufficient to support denaturalization.

### 1.  *Commission of unlawful acts during the statutory period*

Pursuant to 8 U.S.C. § 1427, a person seeking naturalization must demonstrate "good moral character" beginning five years before filing an application through the time citizenship is granted.  Among other possibilities, if an applicant "[c]ommitted unlawful acts that adversely reflect upon the applicant's moral character, or was convicted or imprisoned for such acts," then he does not have good moral character for naturalization purposes, unless "extenuating circumstances" are shown. 8 C.F.R. § 316.10(b)(3)(iii).

Defendant filed for naturalization on July 6, 1995, and the relevant statutory period therefore began on July 6, 1990, and ran through final approval of his application and grant of naturalized citizenship on January 31, 1996.  Defendant pleaded guilty to aiding and abetting the introduction and delivery for introduction into interstate commerce misbranded food in the form of various quantities of repackaged infant formula worth approximately $1.5 million, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 331(a), 333(a)(1).  The criminal actions supporting this offense occurred between approximately August 1994 and March 1995—entirely within the relevant statutory period.

Plaintiff argues that by virtue of committing unlawful acts adversely reflecting on his character during the statutory period, Defendant necessarily failed to demonstrate the statutorily required good moral character and therefore illegally procured naturalization.  While admitting to having pleaded guilty to an unlawful act that occurred during the statutory period, Defendant stresses that the offense was not an aggravated felony, but merely a misdemeanor.  Furthermore, Defendant claims not to have known that his conduct was unlawful at the time.

Notwithstanding Defendant's contrary argument, pursuant to 8 C.F.R. § 316.10(b)(3)(iii), an applicant lacks good moral character if he commits some unlawful act *other than* those listed under subsections (b)(1) and (b)(2)—to wit, other than an aggravated felony—so long as that unlawful act "adversely [reflects] upon the applicant's moral character."  Accordingly, whether the unlawful act resulted in a misdemeanor plea agreement or a felony conviction is not dispositive.  Under either circumstance, for purposes of naturalization, an applicant will be found to lack good moral character if that unlawful act adversely reflects on his character.

Thus, the question is whether Plaintiff has shown by clear and convincing evidence that Defendant's involvement in repackaging infant formula adversely reflects on his character such

that Plaintiff is entitled to judgment as a matter of law.  Defendant's knowledge of the lawful or unlawful nature of conduct is not necessarily relevant to determining whether he demonstrated good moral character during the statutory period.  Regardless of legality and knowledge thereof, the Court readily recognizes that some acts adversely reflect on a person's moral character strictly owing to the nature of the act itself.

Here, we consider the repackaging of infant formula, conduct that potentially threatens the health of the youngest and most vulnerable among us, for little more than economic gain.  According to Defendant's plea colloquy, he committed a number of unlawful acts in support of this scheme. Def.'s Ex. A, ECF No. 24-2.  When Defendant directly or indirectly caused dates to be placed on infant formula cases, he did so with full knowledge that the manufacturers used those dates to signal the "use by" dates on all the individual cans therein. *Id.*  That knowledge, however, did not prevent Defendant from then placing individual cans with various "use by" dates into the cases. *Id.*  These unlawful and fraudulent acts adversely reflect on Defendant's moral character, demonstrating a willful disregard for public health and fair dealing.

Defendant suggests that extenuating circumstances exist excusing his unlawful conduct during the statutory period.  Apart from points already considered, Defendant adds that the relevant conduct occurred over three years before his indictment and Defendant was cooperative with authorities.  Neither point suggests extenuating circumstances that would allow the Court to ignore the fact that Defendant's unlawful conduct adversely reflects on his moral character.  First, revocation of naturalization here has nothing at all to do with the timing of criminal charges, instead focusing on the timing of unlawful conduct.  Defendant's admitted unlawful conduct occurring completely within the statutory period.  Second, and quite simply, cooperation with authorities is not an extenuating circumstance justifying or excusing his unlawful conduct.

The undisputed evidence in the record demonstrates that Defendant committed unlawful acts during the statutory period.  Because those unlawful acts clearly adversely reflect on Defendant's moral character, Defendant did not have the good moral character required and therefore illegally procured naturalization.  Even making inferences in favor of Defendant, the Court readily finds that there is no genuine issue of material fact as to whether Plaintiff has offered clear, unequivocal, and convincing evidence supporting denaturalization and Plaintiff is entitled to judgment as a matter of law.  On this basis alone, revocation of naturalization is required, but the Court will nonetheless continue to consider Plaintiff's remaining three theories.

2.  *Commission of a crime of moral turpitude*

Any "alien convicted of, or who admits having committed or who admits committing acts which constitute the essential elements of" "a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime" cannot be admitted to the United States. 8 U.S.C. § 1182(a)(2)(A)(i)(I). Before considering whether Defendant's conduct amounts to a crime of moral turpitude, Defendant argues that the petty offense exception provided by 8 U.S.C. § 1182(a)(2)(A)(ii) applies:

> Clause (i)(I) shall not apply to an alien who committed only one crime if—
> . . .
>> (II) the maximum penalty possible for the crime of which the alien was convicted (or which the alien admits having committed or of which the acts that the alien admits having committed constituted the essential elements) did not exceed imprisonment for one year and, if the alien was convicted of such crime, the alien was not sentenced to a term of imprisonment in excess of 6 months (regardless of the extent to which the sentence was ultimately executed).

Because Defendant pleaded to a single-count information and was sentenced to only a three year term of probation and a $2,000 fine, he argues he is within the petty offense exception to the moral turpitude bar.  In response, Plaintiff argues that "[e]ach criminal overt act—each time

[Defendant] caused misbranded infant formula to enter into interstate commerce—amounts to a separate offense, regardless of [Defendant's] plea deal." Pl.'s Reply, ECF No. 29 at 2 (citing *U.S. v. Jefferson*, 674 F.3d 332, 367 (4th Cir. 2012), *Blockburger v. U.S.*, 284 U.S. 299, 302 (1932)). Indeed, statutory exception plainly provides consideration of not only convictions, but also admissions by an applicant to conduct constituting an offense. Thus, the court must consider whether Defendant has admitted acts constituting more than one offense.

Admitting continuing involvement over the course of several months, Defendant pleaded guilty to a single violation of 21 U.S.C. 331(a), which prohibits:

> "[t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, tobacco product, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded."

Considering the appropriate unit of prosecution under the statute, the Court agrees that "its language suggests that the violation consists of individual acts ("doing of any act"; "if such act is done") and not many acts together." *U.S. v. Salerno*, No. 3:10-cr-301, 2011 WL 6141017, at *3 (M.D. Pa. Dec. 9, 2011).

Accordingly, because Defendant admitted to conduct constituting numerous violations of 21 U.S.C. 331(a) over the course of several months, he is not entitled to benefit from the petty offense exception. Without the benefit of that exception, the Court must consider whether Defendant's admitted conduct amounts to a crime of moral turpitude.

Crimes involving fraudulent or dishonest activity commonly fall into the category of "crimes involving moral turpitude." *Kporlor v. Holder*, 597 F.3d 222, 225 (4th Cir. 2010) ("The Supreme Court long ago explained in the immigration context that '[w]hatever else the phrase "crime involving moral turpitude" may mean in peripheral cases, the decided cases make it plain

that crimes in which fraud was an ingredient have always been regarded as involving moral turpitude.'" (quoting *Jordan v. De George,* 341 U.S. 223, 232 (1951))).

The undisputed evidence in the record demonstrates that Defendant participated in an ongoing criminal scheme to repackage infant formula during the statutory period. *See* Def.'s Ex. A, ECF No 24-2.  While Defendant maintains that he was unaware of the criminal nature of his conduct, he admits to knowingly directly or indirectly causing cases of infant formula to bear false and misleading "use by" dates. *Id.*  Notwithstanding Defendant's plea to a misdemeanor offense lacking a scienter requirement, his undisputed conduct clearly constitutes criminal conduct in which fraud was a central ingredient sufficient to be considered a crime of moral turpitude for naturalization purposes.

3. *False testimony to INS during naturalization process*

Under 8 U.S.C. § 1101(f)(6), a person shall be deemed not to be of good moral character if he "'has given false testimony for the purpose of obtaining' immigration or naturalization benefits." *Kungys*, 485 U.S. 759, 779 (1988).  In this context, "'testimony' is limited to oral statements made under oath" and it "does not include 'other types of misrepresentations or concealments, such a falsified document or statements not made under oath.'" *Id.* at 780.  To fall into this prohibited category, the individual must have had the subjective intent to deceive when giving the false testimony. *See id.* at 779-80.  There is no express materiality requirement under § 1101(f)(6), and the Supreme Court has specifically declined to engraft such a requirement. *Id.* at 779–80.

The Government argues that Defendant gave false testimony during the naturalization process by answering "no" to the question of whether he had ever "knowingly committed any crime for which [he had] not been arrested."  While Defendant appropriately points to the narrow definition

12

of "testimony" provided by *Kungys*, 485 U.S. at 780, which excludes falsifications in documents, Defendant's identical statements made under oath during his naturalization interview, if false, would result in a finding that he was not of good moral character under the statute.  Falsity here necessarily turns on Defendant's knowledge that the infant formula repackaging scheme was criminal.

According to Defendant, "at the time he completed Form N-400 and subsequently naturalized he was not aware his conduct was criminal in nature."[3] ECF No. 28 at 9.  Frankly, it strains credibility to suggest that Defendant was not aware of the criminal nature of the infant formula repackaging scheme.  Beyond the direct acts he engaged in, Defendant was aware of two federal search warrants being executed at properties involved in the scheme—one such warrant was being executed as Defendant attempted to deliver repacked cases.  Arguably, the nature of the conduct itself in combination with ongoing federal investigations would have alerted Defendant to the unlawful nature of the scheme.  However, for purposes of summary judgment, this Court's skepticism simply cannot be relied upon to meet Plaintiff's considerable burden of producing clear and convincing evidence that Defendant knew his conduct was criminal at the time of his naturalization interview.  Taking every possible inference in favor of Defendant as the nonmoving party, whether Defendant in fact knew his conduct was unlawful at the time of naturalization remains a contested issue of material fact.

---

[3] As alleged in Paragraphs 33 and 34 of the Complaint, "Question 15(a) on the N-400 form asked whether Jammal had ever "knowingly committed any crime for which you have not been arrested?" Jammal answered "no" to Question 15(a) on the N-400 form" and that answer was "false." Complaint, ECF No. 1 at 6.  By his Answer, Defendant admitted both paragraphs. Answer, ECF No. 17 at 5.  However, Defendant did not admit structurally similar paragraphs of the Complaint alleging that Defendant had falsely testified under oath during his INS interview. *Id.* at 5.  Notwithstanding these arguably inconsistent answers, the Court understands Defendant's arguments as represented in his Response; namely, that he answered the questions truthfully, to the best of his knowledge, and only later he understood his truthful answers had been factual incorrect.

**B. Concealment or Willful Misrepresentation**

Section 1451(a) also "provides for the denaturalization of citizens whose citizenship orders and certificates of naturalization 'were procured by concealment of a material fact or by willful misrepresentation.'" *Kungys*, 485 U.S. at 767.  The Supreme Court has explained that this provision imposes "four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Id.* at 768.

In a revocation proceeding under § 1451(a) based on willful misrepresentation of material facts or concealment, intent to deceive must be proven. *United States v. Tooma*, 187 F. Supp. 928, 930 (E.D. Mich. 1960) ("[T]o establish concealment of a material fact or willful misrepresentation, the Government must go beyond the mere falsity of an answer and must demonstrate knowledge of the falsity of the statement and the intent to deceive.") (citing *Knauer v. United States*, 328 U.S. 654 (1946); *United States v. Tuteur*, 215 F.2d 415 (7th Cir. 1954); *United States v. Pellegrino*, 155 F. Supp. 726 (S.D.N.Y. 1957)); *see also United States v. Okeke*, 671 F. Supp. 2d 744 (D.Md. 2009) (emphasizing that willfulness must be shown).

In the context of naturalization proceedings, as elsewhere in the law, "a concealment or misrepresentation is material if it 'has a natural tendency to influence, or was capable of influencing, the decision of' the decisionmaking body to which it was addressed. *Id.* at 770 (quoting *Weinstock v. U.S.*, 231 F.2d 699, 701-02 (D.C. Cir. 1956); *U.S. v. Corsino*, 812 F.2d 26, 30-31 (1st Cir. 1987)).  Because materiality depends on interpretation of underlying substantive law, it is a question of law that merely rests on factual evidence. *Kungys*, 485 U.S. at 772 (analogizing materiality in the naturalization context to materiality as an element of perjury).

14

As above, because Plaintiff has not come forward with clear and convincing evidence demonstrating that Defendant *knew* his answer to Question 15(a) was false at the time, Plaintiff is not entitled to judgment as a matter of law on the present record. Accordingly, the Court declines to consider the parties' arguments concerning materiality of the allegedly willful misrepresentation.

## IV.   CONCLUSION

On at least two grounds, the undisputed evidence leaves no genuine issue of material fact and Plaintiff has produced clear, unequivocal, and convincing evidence supporting denaturalization.  Accordingly, Plaintiff is entitled to summary judgment as a matter of law.

For the foregoing reasons, Plaintiff's Motion for Summary Judgment is **GRANTED**. The Court **ORDERS** that Defendant Samih Fadl Jammal's certificate of naturalization is hereby **CANCELED** and that he must surrender to the U.S. Attorney General or his representative, within ten days of the entry of the order, his certificate of naturalization (No. 21808838), along with his passport, his voter registration card, and any other indicia of United States citizenship in his possession or under his dominion or control.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:          February 9, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE

15